## Case No. 12,811.

### In re SHORTER.

[Mobile (Ala.) Reg. & Advertiser. Dec. 17. 1865.]

District Court, D. Alabama. Dec. 16, 1865.

CONSTITUTIONAL LAW—TEST OATH FOR ATTORNEYS IN FEDERAL COURTS— EX POST FACTO LEGISLATION.

[The act of January 24. 1865 (13 Stat. 424), forbidding any attorneys to practice in the federal courts except upon taking the test oath prescribed by the act of July 2, 1862 (12 Stat. 502), whereby the affiant is made to swear that he has never borne arms against the United States, or furnished aid or encouragement to their enemies. is unconstitutional, because the matter of regulating the admission of attorneys to practice is left by the constitution to the courts themselves, to be exercised according to the provisions of the common law, and is not delegated to the legislative power; because it deprives attorneys previously admitted to practice of substantial rights, in the nature of property, without due process of law. and compels them to be witnesses against themselves; and because it operates as an ex post facto law.]

[Cited in Ex parte Law, Case No. 8,126.]

[This was an application by John Gill Shorter and others, attorneys, for leave to practice in the federal courts without taking the test oath prescribed by the act of January 24, 1865, entitled "An act supplementary to an act to prescribe an oath of office and for other purposes."]

BUSTEED, District Judge. One of the most difficult and certainly one of the most delicate duties that a court of justice can be called upon to discharge is to pronounce upon the constitutionality of legislation. There is that in the very nature of this act calculated to inspire the utmost circumspection, not perhaps unaccompanied by something resembling fear. It is no light matter to attack the binding force of congressional enactments. Every presumption is in favor of their validity. The legislature of a people is a nation in concrete; representing its wisdom and its will. The motives which influence the conduct of its members are beyond the pale of legal investigation and may be inquired of only in foro conscientiæ; and in this tribunal each legislator both prosecutes and defends, and is witness, juror and judge. One of the fathers of American jurisprudence said that it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. This is the standard by which the propriety of judicial interference with the operation of a statute should. be determined, and I accept the rule with the profoundest reverence for the learning and wisdom of its author. It is under the direct influence of such sentiments that I approach the consideration of the question presented for adjudication; and when I take into account the deference that is due to legislative and executive departments of the government, the real magnitude of the matter itself, the interests involved, and the paucity of my own powers. I cannot repress the wish that I had been spared this ordeal. To do one's whole duty in whatever sphere of life; to do it truly as it respects conscience and intelligence,—is, however, all that may be required of any. To do this is to keep the oath I took, to "administer justice without respect of persons; to do equal right to the poor and rich; and faithfully and impartially to discharge and perform all the duties incumbent upon me as a judge, according to the best of my ability and understanding, agreeably to the constitution and laws of the United States."

The whole structure of American, and indeed of republican, government, rests upon the distribution of power among the several bodies of its magistracy. It has passed into an axiom that the legislative, executive. and judicial departments ought to be separate and independent each of the other. Mr. Madison denominates this separation and independence the "essential precaution in favor of liberty," and declares that the accumulation of these powers in the same hands "may justly be pronounced the very definition of tyranny." It is not to be denied either that legislative bodies, elected by and from among the people, are more or less actuated by the passions and prejudices which, for the hour, rule and govern their constituencies. To imagine popular representatives free from such influences, is to suppose them more than men; and to presume that their conduct will not be in some degree controlled by considerations of what is agreeable to those upon whose suffrages they depend, is to fly in the face of all nature and experience. It was to correct this tendency and to save to the whole people their constitutional rights. that the system of checks and balances was adopted, which distinguishes the American government from all others. "It may be a reflection on human nature, that such devices should be necessary to control the abuses of government, but what is government itself, but the greatest of all reflections on human nature? If men were angels no government would be necessary." To each of the departments of the government of the United States the constitution says, "Thus far shalt thou go, and no farther." To each is assigned limits which it may not lawfully pass. Each is a guardian of the public against the aggression of the other. Each, within its sphere, an honored agent of the general harmony and safety. and each an usurper eo instanti it steps beyond its circumscribed boundaries,—each obliged. upon pain of being derelict and foresworn, to adopt as its motto,

"Justice is the end of government." The legislature is to make the laws. The executive is to approve them and see that they are carried into effect. The judiciary is to expound them and administer them, and, when questions are raised upon them, to decide whether they are consonant or repugnant to the constitution. The legislature that should refuse to pass all needful laws for the regulation of the body politic would palpably violate its duty; the executive who should neglect to approve and execute constitutionally enacted laws would be undeserving his high office; and the judiciary that does not interpret, pronounce, and apply the laws so made and approved is culpable beyond comparison.

On the 2d day of July, 1862, the congress of the United States passed an act entitled, "An act to prescribe an oath of office, and for other purposes." By its terms every person who, after its passage, should be elected or appointed to any civil, military, or naval office under the government, before entering upon its duties, and before being entitled to its remunerations, is obliged to take and subscribe to the following oath, or affirmation: "I do solemnly swear, or affirm, that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel or encouragement to persons engaged in armed hostility thereto; that I have neither sought, nor accepted, nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States hostile or inimical thereto." It is important to observe here that this qualifying oath has reference only to persons who aspire to positions of honor or profit under the government. It has no application to the community at large, or to any particular class of citizens. It is directed against office-holders as such. One of the penalties provided in the statute for falsely affirming under it, is that "the person shall be deprived of his office and rendered incapable forever after of holding any office or place under the United States." The intention of congress, if we may derive it from the political circumstances of the times, was that no person who aided in the attempt to destroy American nationality should again be trusted with the authority or honored with the offices of the republic. It was notorious that men who had been educated in the military and naval schools of the nation, at the expense of the public, had joined in and often led the revolt against the national sovereignty, and that others, connected with the administration of civil affairs, left their places in congress, and in the cabinet, and on the bench, and formally renounced their allegiance to the United States. To secure the country from a recurrence of such a state of facts, so far as the legislative imposition of qualification for office could accomplish this, was, beyond question, the intention of the lawmakers, and there is nothing in such a law repugnant to reason, religion, or natural rights. It is plainly within the power of congress to say to a candidate for the benefactions of the offices of the republic, "You must, as a condition precedent to enjoying these, furnish a guarantee of an oath that you have not done, and will not do, any act inconsistent with the honor of the government, or that will endanger its perpetuity." No man has an inchoate or vested right in these, and places of honor and emolument should be the rewards of capacity, patriotism, and fealty.

On the 24th day of January, 1865, congress passed an act in these words: "Be it enacted," &c., "that no person, after the date of this act, shall be admitted to the bar of the supreme court of the United States, or at any time after the 4th of March next, shall be admitted to the bar of the circuit and district court of the United States, or of the court of claims, as an attorney or counselor of such court or shall be allowed to appear and be heard in any such court, by virtue of any previous admission, or any special power of attorney, unless he shall first have taken and subscribed the oath prescribed in an act to prescribe an oath of office, and for other purposes, approved July 2d, 1862, according to the forms and in the manner in said act provided; which said oath so taken and subscribed shall be preserved among the files of such court, and any person who shall falsely take the said oath, shall be guilty of perjury, and on conviction shall be liable to the pains and penalties of perjury, and the additional pains and penalties in the said act provided." It is claimed that this act contravenes several provisions of the fundamental law, and the power of the courts is now invoked to prevent its going into operation. Its unconstitutionality is asserted upon several grounds, and if these objections, or any of them, are well taken, the act must be declared of no effect and void. Without repeating the argument of counsel, all of whom, both at Montgomery and Mobile, have exhibited great learning and close study of and familiarity with the civil, common, and statute law, the objections urged against this enactment may be thus stated.

It is claimed to be unconstitutional, because: First, it virtually takes from the courts, and gives to the legislature, the power to license attorneys and counselors. Secondly, because it requires a new qualification in attorneys and counselors, which has no aptness in itself, and which is not necessary to the faithful and skillful discharge of a lawyer's vocation. Thirdly, because congress has no right to prescribe such an oath for an attorney, any more than it has a right to prescribe it for a farmer or a mechanic.

Fourthly, because it deprives a man of his property without due process of law, and holds him to answer for an infamous crime without presentment or indictment of a grand jury, compels him to be a witness against himself, and deprives him of the right to a trial by an impartial jury of the state and district wherein the alleged crime was committed. Fifthly, because it trenches upon the pardoning power of the executive, rendering amnesty or pardon of no effect to restore the subjects of these benefits to their original status. Sixthly, because it deprives the citizen of his right "to have assistance of counsel for his defense" in the national courts. Seventhly, because it is in the nature of a bill of attainder, and an ex post facto law. And, lastly, because it is against the common right.

All of these objections to the law of January 24, 1865, have been urged with a zeal and earnestness which could only spring from a deep belief in their justice on the part of counsel. History, experience, and precedent have been arrayed in support of the views so ably presented by the distinguished lawyers selected to discuss the question; and, however I may differ from some of the propositions advanced, I gratefully acknowledge the assistance afforded me by the arguments of my brethren of the bar.

Does the law of congress of January 24, 1865, conflict with any of the provisions of the constitution of the United States? If it does, and this appears, the law is void, and the courts must so adjudge it. It certainly has some marked and unusual characteristics. It inaugurates in American history a new kind of legislation, at war with previously conceived and very generally entertained ideas. It is of the species known as "class legislation"; that is to say, its provisions are not of general application to the whole community. It lacks the "universality" and "uniformity" which Blackstone declares are of the essence of a law, and its requirements and prohibitions are confined to a limited number of persons, and a particular calling in life. Such an enactment, to be binding, must strictly observe and keep within constitutional limitations. If enacted at all, it shall not exceed, in the least, the authority for its creation.

The law is retroactive as well as retrospective. It deals in rights and privileges which were vested before its passage. In the case of a citizen by birth, it embraces the entire period of his existence, and holds inquisition upon it. A French writer of distinction says that such laws "are illegal in principle and disastrous in results." Another publicist, of equal fame, says, "The retroaction of laws is the greatest crime in legislation." The constitution of the state of New Hampshire declares that "retrospective laws are highly injurious, oppressive and unjust." Chancellor Kent, in Dash v. Van Kleeck (N. Y.) 7 Johns. 477, uses this language: "As often as the question has been brought before the courts of justice in this country, they have uniformly said that the objection to retrospective laws applies as well to those which affect civil rights as to those which relate to crime." The law of 1862, as we have seen, relates to persons seeking office or place under the United States. The law of 1865 does not relate to persons holding or seeking office or place in any department of the public service. Lawyers, eo nomine, cannot be said to be officers of state. They are, to all intents and purposes, as much private citizens as the members of any other avocation, trade, or pursuit.

Lastly, in enumerating its distinctive features, the law may be said to be highly penal in its general scope and effect.

Now, it cannot be all this, and yet allowed to stand. Being all this, it must stand, unless it violates some principle of the constitution. We have seen that the courts have nothing to do with the motives or the policy that instigate legislation. The first of these may be corrupt, and the last ill advised, but the judiciary cannot look at either of them. The intention of the lawgiver must be gained from the words he uses, not from the impulses that govern him.

We recur, then, to the question, is this law unconstitutional in all or any of the respects claimed by those who oppose it? And, first, has congress the right to prescribe qualifications to persons who desire admission to the bar of the national courts, as attorneys or counselors? The thirty-fifth section of the act of September 24, 1789 [1 Stat. 92], provides that, in all the courts of the United States, the parties may plead and manage their own causes personally, or by the assistance of such counsel or attorneys at law as by the rules of said courts respectively shall be permitted to manage and conduct causes therein." This act, it will be remembered, was passed shortly after the adoption of the national constitution, and when the principles upon which it was founded were familiar to the mind of every statesman and politician. It was intended by the legislature to carry into effect that provision of the organic law which provides that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as congress may from time to time establish." The thirty-fifth section of this act is a clear concession to the courts of exclusive jurisdiction over the subject of the admission of attorneys and counselors to practice, and may, I think, be taken as an acknowledgment by congress that this is a matter within the "judicial power of the United States." It is certain that the courts have uniformly acted upon this understanding, and until the passage of the law of January 24, 1865,—nearly eighty years,—congress has not attempted to exercise any control over the subject.

In the case of Ex parte Secombe, reported in 19 How. [60 U. S. 9], which was an appli-

cation for a writ of mandamus to the judges of the supreme court of the territory of Minnesota, commanding them to vacate an order made for the removal of the relator from the roll of attorneys. Chief Justice Taney says that, in a court of the United States, the relations between the court and the attorneys and counselors who practice in it, and their respective rights and duties, are regulated by the common law. And he adds, "It has been well settled by the rules and practice of common-law courts that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counselor, and for what cause he ought to be removed." The power, the chief justice declares, is not an arbitrary one, but must be exercised and regulated "by a sound and just judicial discretion, whereby the rights of the bar may be scrupulously guarded and maintained by the court as the rights and dignity of the court itself." It is plain that any other doctrine would lead to interminable disorder in the courts. If congress may, ex mero motu, enact that a man who has aided in the Rebellion shall thereafter be absolutely disqualified from practicing law in the national courts, notwithstanding that he has been previously admitted under their rules, why may not congress enact that a man shall be allowed to practice in those courts without any other qualification than having fought under the banners of the republic? If the former may be decreed as a penalty, why not the latter as a reward? Where shall the power of the courts over the conduct and qualifications of attorneys end, and where the power of congress begin? How shall the conflict of jurisdiction that might arise be settled? It must not be forgotten that congress does not originate either the national courts themselves, or the office, privilege, or franchise of an attorney and counselor in those courts. If it did, I am not prepared to say that it could not annex such conditions to the enjoyment of the privilege as it might consider wise and just.

Let us now look at the objections made to the law on the more substantial grounds urged against it. Does it deprive a man of any advantage which he had legally acquired, and how shall this be tested? It is the indisputable right of the citizen accused of an offense to be tried by an impartial jury of the state and district wherein the crime shall have been committed, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, and in no criminal case to be compelled to be a witness against himself. These are among the most solemn of all the guaranties of the constitution. They are not concessions to liberty, as is sometimes supposed; they are restraints upon government, and bulwarks against oppression. Does this law prescribe a crime, and affix a penalty to its commission? What is crime? Is it not some act for which a person may be punished? What is punish-

ment? Is it not the absolute or partial deprivation or curtailment of some right or enjoyment previously possessed? Punishment, to be such, need not be corporeal. The first murderer did not expiate his offense with his life, or by imprisonment. The sentence pronounced against him was, "A fugitive and a vagabond shalt thou be on the earth;" and in his agony the criminal cried out, "My punishment is greater than I can bear." That this statute does prescribe a crime is too plain to need argument and that it affixes a penalty to its commission is equally clear. Does it not also take from the person against whom its provisions are leveled the benefit of presumptive innocence, when it requires a man to take an expurgatory oath as a condition to exercising a privilege which, if he were not guilty as specified in the act, he would be allowed? Is not this in fact to oblige a man to be a witness against himself? The maxim of the law is, "Accusare nemo debet se, nisi coram Deo." The demand of this statute is that by the offer of affirmative proof of innocence the applicant for admission to practice shall create, as against himself, a presumption of guilt.

It is unworthy of the great question to say that a man is not obliged to put himself in the supposed dilemma; that all he has to do is not to attempt the practice of his profession in the national courts, and he will not run the risk of testifying to his own guilt. This is the merest and the shallowest sophistry. If he keep silence, he is thereby deprived of a constitutional right; if he speak, he becomes "a witness against himself." Judgment of condemnation instantly follows the coerced acknowledgment of guilt, and an act of the legislature is thus made to take the place and exercise the functions of the judicial office. Now, if congress can bring about such a result to a man, is it not doing by indirection what it is expressly prohibited from doing directly?

It has been strongly urged upon the argument that this law of January 24, 1865, is in the nature of a bill of attainder, and if it be liable to this charge it cannot stand. Congress is expressly prohibited from passing such a law. It is well settled that bills of attainder, as they are technically called, include what are known as bills of pains and penalties. [Fletcher v. Peck] 6 Cranch [10 U. S.] 138; 1 Kent, Comm. p. 382, § 19; and Story, Comm. Is not the law of January 24, 1865, such a bill? Does it not in fact disfranchise the class of men known as lawyers, under the pain of their not taking the oath it prescribes? Is not this the logical and necessary consequence of their refusal? Does it not disfranchise them when it requires them to take the prescribed oath before they can exercise their vocation? Is it not an assumption by the legislature of judicial magistracy? Is it not "pronouncing upon the guilt of the party without any of the common forms and guards of trial?"

I will now consider the objection that this statute is in the nature of an ex post facto law. Congress is restrained, in express terms, from passing a law of this character, and history is full of warning against the impolicy and wickedness of declaring an act to be criminal which, at the time of its commission neither involved moral turpitude, nor transgressed the written code. If a statute does this, and affixes a penalty to the act, it is ex post facto; or if, by a statute passed subsequently to the commission of a crime, the punishment for that crime is increased, or "different or less evidence is required to convict an offender than was required when the act was committed," the law is ex post facto. One of the clauses in the act of congress of the 2d of July, 1862, and which is embraced in the oath required by the act of January 24, 1865, is as follows: "That I have neither sought nor accepted nor attempted to exercise the functions of any office whatever under any authority, or pretended authority, in hostility to the United States." This abjuration is not confined to any period. It covers the lifetime of the affirmant. Before the 24th of January, 1865, a British subject could be admitted to all the rights of citizenship in the United States by taking the oaths of naturalization. Without being naturalized, he might be admitted to the bar of this court, upon complying with the rules of the court. But if, during the period of war between the United States and Great Britain, a half century ago, he had held office in the kingdom of which he was native, and was then a subject, he could not comply with the requisitions of this statute, and could no longer exercise his privilege as a member of the bar of this court. The right acquired by his naturalization and by the rules and orders of the court would be annulled by a law ex post facto, and for an act innocent, and even praiseworthy, when it was done. Other illustrations, by way of example, occur to the mind, but it is not necessary further to pursue this line of thought; nor do I consider it requisite to the adjudication of the question before me to enter into the examination of any other of the grounds of objection to the act taken by counsel on the argument. As to all these, I do not express either dissent or agreement.

I am of opinion that the act of the 24th of January, 1865, supplementary to the act of July 2, 1862, violates several of the provisions of the constitution, and it is the right of those whose interests are to be affected that I should declare the conclusions which I have reached. If these conclusions are not founded in reason and law, the supreme court of the United States, now in session, can correct the error, and I will gladly reform my judgment by the standard of its excellence.